## KEYSTONE TYPE FOUNDRY v. FASTPRESS CO.

(District Court, S. D. New York. March 18, 1919. On Rehearing on Cross-Bill for Patent Infringement, February 10, 1920.)

1. COURTS ⊜⇒96(1)—DISTRICT COURT DECISIONS AS TO PRIORITY OF LICENSES OVER SUBSEQUENT ASSIGNMENT OF PATENT FOLLOWED.

   The rule that a license from a patentee prevails over a subsequent assignment is so well established by decisions of the District Courts that, although not confirmed by any appellate court, it will be followed by a District Court until changed by an appellate court.

2. PATENTS ⊜⇒183—INVENTOR MAY ASSIGN RIGHTS PRIOR TO PATENT.

   An inventor has property which he may assign prior to patent, at least when an application is pending and the patent is specifically described.

3. PATENTS ⊜⇒211(2)—AGREEMENT WITH ·PLAINTIFF FOR EXCLUSIVE LICENSE HELD TERMINATED PRIOR TO ASSIGNMENT UNDER WHICH DEFENDANT CLAIMED.

   Facts *held* to show that an agreement between plaintiff and an inventor, providing for a probationary period during which the invention was to be tested, after which plaintiff could elect to take an exclusive license for two years, had terminated prior to the assignment by the inventor under which defendant claimed.

4. PATENTS ⊜⇒212(2)—AGREEMENT TO CONVEY APPLICATIONS AND PATENT IS VALID AND SUPERIOR TO SUBSEQUENT AGREEMENT TO GIVE LICENSE.

   An agreement to convey applications for a patent on an invention and the consequent patent is valid in equity, and takes precedence over a subsequent agreement to give an exclusive license, though it does not purport to make a present conveyance of the applications, and no applications have in fact been filed.

### On Rehearing on Cross-Bill for Patent Infringement.

5. PATENTS ⊜⇒328—PATENT FOR PRINTING PRESS NOT INVALID FOR INOPERABILITY.

   The Stonemetz patent, No. 1,188,507, for a printing press, *held* not invalid for inoperability.

6. PATENTS ⊜⇒312(1)—PRESUMPTION OF OPERABILITY MUST BE OVERCOME BY INFRINGER.

   On cross-bill for infringement of a patent, plaintiff in original bill has the burden of overcoming the presumption of operability.

7. PATENTS ⊜⇒47—INOPERABILITY OF DISALLOWED CLAIMS DOES NOT DEFEAT PATENT, WHERE KNOWN ELEMENTS MAY BE SUBSTITUTED SO AS TO RENDER MACHINE OPERABLE.·

   Where the claims on which a patent was granted were operable, but disallowed claims were inoperable, and not mechanically separable, and rendered the whole machine inoperable as disclosed, but known elements were available, which could be substituted by a skilled artisan for the disallowed elements, so as to make the machine operable, the patent is valid.

8. PATENTS ⊜⇒312(1)—INFRINGER MUST SHOW NONEXISTENCE OF ELEMENTS WHICH MAY BE SUBSTITUTED FOR DISALLOWED INOPERABLE ELEMENTS.

   An infringer, seeking to show that the disclosure is inoperable because of unpatented elements must show that there were no known elements which it was within the competence of a skilled artisan to substitute, so as to produce an operable machine in combination with the patented elements.

In Equity. Suit by the Keystone Type Foundry against the Fastpress Company. Bill dismissed, and injunction granted on the cross-bill.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

· E. W. Bradford, of Washington, D. C., for plaintiff.
George E. Scull, of New York City, for defendant.

LEARNED HAND, District Judge. [1] The decisions have for so long held that a license from a patentee prevails over a subsequent assignment that I do not feel free to disregard the rule so established. Chambers v. Smith, Fed. Cas. No. 2,582; 5 Fish. Pat. Cas. 14; Farrington v. Gregory, Fed. Cas. No. 4,688, 4 Fish. Pat. Cas. 221; Hamilton v. Kingsbury, Fed. Cas. No. 5,984, 17 Blatch. 264; Jones v. Berger (C. C.) 58 Fed. 1006. I have not found that this rule has been confirmed by any appellate court, and it seems to me open at least to some doubt whether agreements to license, so far as they operate in futuro, are more than executory contracts, which would under ordinary rules yield to the legal title of a bona fide purchaser. Under the statute (R. S. § 4898 [Comp. St. § 9444]), an unrecorded earlier assignment is invalid, and a result is surely somewhat anomalous which leaves a licensee, who takes no interest in the property in a stronger position than an assignee, who has become the owner in whole or in part. Nevertheless, if the rule is to be changed, it must certainly be by an appellate court, and I accept it for the purposes of this case.

[2] Now, it is true that in none of the cases, so far as I have found, has the license been upon an invention not yet patented; still, since Gayler v. Wilder, 10 How. 477, 493, 13 L. Ed. 504, it must be taken as law that an inventor has property which he may assign prior to patent, at least when application is pending and the patent is specifically described. Wright v. Randel (C. C.) 8 Fed. 591, 19 Blatch. 495. Whether by a parity of reasoning an agreement to give an exclusive license, which does not amount to an assignment and which is made before the application is filed, takes precedence over a later assignment, I need not inquire. I shall so assume, and in consequence I shall assume that, if the contract between Stonemetz and the plaintiff of December 3, 1913, still subsisted on May 12, 1915, the defendant's rights under the latter were subject to its provisions. The first question is whether it had terminated.

[3] Assuming the contract to be a license, and not an assignment, under which assumption alone the plaintiff could in any event succeed, it is apparent that it contemplated a probationary period of 30 days within which the plaintiff was to "try out" the press and decide whether it was satisfactory. That the plaintiff never found the press satisfactory is amply proved, and is, indeed, not denied. It kept it for some time, at least till the spring of 1915, and certainly not until August of that year. Some time within that period, after more or less persistent "tinkering," to use the witnesses' words, it sold the press in what was recognized to be an imperfect and unsatisfactory condition, and, indeed, in spite of Rowley's protest. This sale is alone sufficient evidence of the termination of the earlier contract, because it concluded the possibility of any further experiment upon it, and concededly all experiments up to that time had been fruitless. As the success of the press was a condition of acceptance by the plaintiff, it never became a licensee

at all. It is true that it did pay for the machine, and payment taken alone might be enough; but it cannot be taken alone.

Furthermore, it is clear that the plaintiff never supposed itself bound by the license. It did not order the four presses, as it would have been bound to do; it manufactured no machines, and it paid no royalties. At best it could be thought only that the 30 days' probationary period was in abeyance; but, if that be urged, the answer at once arises that from any view the period of probation must end when the machine was sold still unsatisfactory.

It is also clear that Stonemetz supposed the contract to be at an end. He left the plaintiff's shop in the spring of 1914, and only made occasional visits thereafter. He says that Rowley told him the directors had "turned it down"—a statement which Rowley does not contradict, though he does disclaim any authority from them to cancel the contract. He made no claim upon it, and offered his invention to Kopple, which, at least in the case of another man, would have been some evidence of his belief in his freedom. Rowley and Smith may still have had belief in the ultimate success of the press; but it is plain that the plaintiff was through with the experiment, at least for the time being, and supposed the contract ended.

Furthermore, the contents of the second contract are strongly corroborative of this conclusion. The first contract was for a 30-day probationary period, after which the plaintiff could elect to enjoy the patent as exclusive licensee for a period of 2 years at stated royalties, with the privilege of purchase for $5,000. It might extend the contract for 5 years more at the same royalties, with the privilege of purchase for $4,000. There was an option of purchase in either case during the period. The second contract was for an exclusive license to "market" for a period of 12 months—not 2 years—at a royalty differently calculated from the first. Within that period the plaintiff might elect to purchase the patents and pay for them according to three options. These options were, roughly, for either $5,300 in cash and $5,000 in the plaintiff's stock, or for $10,300 in cash. The details of the options I omit.

Now it is quite clear that these two contracts could not stand together. It is true that this consideration is not conclusive, since the second might have been substituted for the first while the first continued; but we should expect the first to have been abrogated by the second, and there is not even an allusion to it. If it be urged that the first was regarded as being still in probation, the 30-day period having been extended to September 9, 1915, it is hard to see why the plaintiff should have agreed to surrender its option to purchase for $5,000 at the end of 2 years and agreed to accept options of very substantially more to be exercised within 12 months. I can read the memorandum for agreement and the actual agreement of September 9, 1915, only as based upon the presupposition that there existed no contractual relations between them at the time.

Kopple's good faith, when his negotiations with Stonemetz opened, does not, therefore, play any part in the case, though it is clear enough that his visit to the plaintiff's shop in the spring of 1915 to inspect the

press would not have been enough to put him on notice if good faith were an issue. When the defendant made the contract of May 12, 1915, it got whatever the terms of its contract conveyed to it, free of any earlier contracts which Stonemetz had made.

[4] Now it is true that Stonemetz's contract with Kopple does not purport to convey the applications in præsenti, since there are no present words of purchase and sale, and indeed no applications had in fact been filed. Possibly it was supposed that the issued patent alone could be conveyed. In any case, it is an agreement to convey the applications and the consequent patent, which was valid in equity. I do not understand that the plaintiff maintains that a subsequent agreement to give an exclusive license would take precedence over it. Though each were cognizable only in equity, priority in time would control. There was no application pending at either time, and at the same time, when the application was filed, the assignment to the defendant was made and recorded.

There remains only the question whether Kopple and Stonemetz had mutually released each other from their contract by oral contract, an issue upon which the plaintiff must rely solely upon Stonemetz's word, which Kopple contradicts. Stonemetz is so completely discredited that it seems unnecessary to discuss his testimony. His attempt to explain his assignment of October 7, 1915, is a pitiable tissue of fabrication, and his letter of September 11, 1915, conclusively disposed of the contention that at that time he had terminated his relations with Kopple.

The case is therefore one in which two quite innocent parties have been practiced upon by a knave, and where one must suffer the loss. It so happens that the defendant unites priority in time with the ownership of the legal title, and that the plaintiff is in the unfortunate position of having neither advantage. The necessary consequence is that the bill must be dismissed, and that the usual decree for injunction must go upon the cross-bill.

Settle decree on notice.

### On Rehearing on Cross-Bill for Patent Infringement.

The suit was to obtain a conveyance by the defendant to the plaintiff of a patent for a printing press issued to John E. Stonemetz on June 27, 1916 (No. 1,188,507). The defendant filed a cross-bill for infringement of this patent. On the first hearing the court decided that the plaintiff was not entitled to the conveyance, and dismissed the bill. As there was no dispute about the cross-bill, the usual decree for injunction was directed upon that. Subsequently the plaintiff moved for a rehearing, to set up that the patent was void for inoperability, and the case was heard upon further evidence.

[5] The single issue, as the case is now presented, is of the operability of the Stonemetz patent, as disclosed, and before Smith worked it over after the Palmyra machine had been delivered in the spring of 1914. I think I must accept as proven that this machine did not register properly; that is, that the sheets were not always fed to the plate, so that the type printed at exactly the same place each time. This pre-

vented any fine work of any kind, and probably anything but the coarsest sort of two or more color work. The reason is plain enough.

If the sheets are thrown back by the stops, *49*, so that their edge is not in contact, when gripped, they will be either slightly askew, or, if they are still in line with the type bed, they will be a short distance beyond the first impression on the sheet (assuming a double printing), or they will have too broad a margin at one end and too narrow at the other. The fault apparently was—at least, there is no other explanation offered—that at some speeds, the grippers moving against the sheets, the stops, *49*, knocked them back out of contact, so that, when the grippers closed, the edge of the sheets was not in contact with the stop. Apparently an independent defect was that the cylinder did not always stop at the same point; but that I think I must put down to improper construction. Certainly it is not shown how the designs, if followed, permitted the cylinder to vary in its point of rest. The difficulty in inking I pass.

The extent to which this defect made the machines inoperative is not quite clear. All four machines manufactured under Stonemetz's patent were returned—the first, or Palmyra machine, which went to Baltimore, the two delivered to New York, and one to Philadelphia. Smith at the first hearing said that the Palmyra machine was not commercially salable, but that some very common and ordinary grades of work might be done upon it. At the second hearing he defined these as grocery bags and the like; but I question whether he did not originally mean to include more than this. After some minor changes, he says that he found that they "could do some work on it," not defined. In August, 1915, when the Palmyra press had been for some time in Baltimore, the plaintiff's salesman wrote of the complaints about it, which were serious, but which appear to have been breakdowns. It seems to me scarcely likely, if it had been inoperative because it failed to register, that this failure would not have reached the salesman, or have been transmitted to Smith. I thought Smith an honest man, but not very capable of taking an impartial view. He had thoroughly made up his mind that Stonemetz's patent was not operative; his own work upon it, indeed, presupposed that as a condition. I believe him capable, quite unwittingly, of overpressing the extent of its defects, and the necessary standard of registry on which the trade insisted, as to which he was certainly very gravely mistaken.

[6] My conclusion on the whole is that the press was incapable of any use except upon the coarser grades of work, but that it would operate as described, and that in single color printing it had a limited value. I think that it was probably useless for multicolor work, except possibly upon such as appears in the comic supplements. I cannot say that it would not do for this, and the doubt makes against the plaintiff, on whom rests the burden of overcoming the presumption of operability.

[7] Now I question very much whether such a finding would serve to defeat the patent, even though it affected that part of the disclosure which was covered by the claims; but I am not obliged to decide that question, and I pass it. Stonemetz originally declared that one of the objects of his patent was to secure perfect registry, and that declara-

tion continued over into the specifications (page 1, lines 26–31). I may assume, for argument's sake, that he quite failed to secure that object. He originally tried to obtain two claims upon this feature, 23 and 24, and they were rejected on Dodge (432,518) and Roeback (421,765). After another attempt he dropped them, and the patent issued without any claim to the grippers and their attendant mechanism. However, the specifications continued to contain this part of the disclosure, now rendered quite unnecessary, as well as the abortive statement of the corresponding object of the patent.

The case is therefore this: A patentee secures claims upon certain features of his disclosure but not upon all. Those on which he obtains claims are operable; those on which he fails prove inoperable. Obviously, if the elements successfully claimed were quite separate mechanically from those unsuccessfully claimed, there could be no question that the claims allowed were valid. In this case the elements are not mechanically separable, and the inoperable elements render the whole machine inoperable as disclosed. It would make no difference that the inoperable elements were dedicated to the public; the public could get no benefit from the operable elements, unless it knew how to associate them with other elements which would result in an operable machine; and so the patent would be void, unless there was adequate information how to substitute for the inoperable elements others which would form such a useful combination.

If, on the other hand, there were such elements available, and if they could be put into an operable combination, then clearly the claims allowed would be valid, because the inoperable elements are by hypothesis not claimed, and the new elements are operable. It is only necessary that the claimed elements shall be capable of operation in any combination whatever; the inoperable elements might by hypothesis have been altogether omitted from the disclosure, which in any case must be read in the light of all prior knowledge. Hence it is only necessary to show that there were such operable elements, and that they could have been used in combination with the new elements covered by the allowed claims.

That there were grippers used upon an oscillating cylinder press, which did not throw the sheets out of register, is proved without contradiction. They existed in the Auto-Press, and they were disclosed in Dodge and Hawkins, where presumptively they were also operable. In Vierengel's patent they were merely indicated, showing that at that time they were sufficiently known to the art to allow their assumption as well-understood details of a printing press. Now it is indeed true that in so complicated a machine the mere knowledge of such elements was not of itself knowledge of how to substitute them, so that they would work as a complete press. Moreover, Smith says that he worked a year to remedy the defect in question, and that Stonemetz at one time said that it could not be remedied at all. However, Smith knew nothing of presses, nor of any of these existing devices, and he was, indeed, not even a machinist, so that his inability at once to substitute an adequate set of grippers is of no consequence. It is not shown, moreover, that Stonemetz knew of the existing devices either.

[8] When an infringer sets out to show inoperability against the presumption of the patent, he must, I think, go further. If he shows that the patented elements will not operate, that, I agree, is enough, since, if they are patented, they must be new in the art, and the existence of valid substitutes would be an answer to their novelty. But when he seeks to show that the disclosure is inoperable because of unpatented elements, he must show that there were no known elements which could go into combination with the patented elements. Perhaps the defendant here might therefore have rested without any proof at all, but he has gone further, and shown that there were such elements, and that they did go into effective combination with printing presses of the same general nature. The plaintiff must, I think, show that it was not within the competence of a skilled artisan to adapt those known substitutes, so used in other presses, to the patented press. He must, in short, show that the disclosure of the patented elements was not adequate, had it stood alone. This he has not shown, and the defense fails.

It is, of course, quite true that under such a disclosure as this subsequent imitators might be misled. They might copy the whole, and find the result inoperative, but that would nevertheless not prevent them from profiting by the patent. By hypothesis they would have at hand a substitute for those elements which would not operate, and these they could use. The fact that they might not in fact know of them is not material, because they are chargeable with knowledge of whatever the art contains.

Claims 9, 10, 11, and 12 have as an element "means controlled by the position of the sheet grippers preventing the lowering of the cylinder to printing position when no sheet is fed to the grippers." It is not apparent to me how the position of the grippers controls the lowering of the cylinder, this being effected by the lowering of the fingers, *110*, into the slots, *111*. This lowers the dog, *113*, and prevents the oscillation of the eccentric, *29*, which raises and lowers the cylinder (page 3, lines 68–80). Granting, however, that these claims involve the specific structure of the grippers, they alone do so. The other claims have no such element. Claims 13–23, inclusive, clearly refer to the fingers with their slots operating upon the shoulder, *115*, of the segment, *116*. At most, claims 9 to 12, inclusive, would be affected, and they are not necessary for a decree.

There appear to be no authorities upon the question, but it is clear in principle, and I see no reason to change the original disposition made of the case.