## KEYSTONE TYPE FOUNDRY v. FASTPRESS CO.

(Circuit Court of Appeals, Second Circuit. February 2, 1921.)

No. 106.

1. **Patents ☞212(2)—Agreement for license effective against subsequent assignee of patent.**

    The inventor of a printing press built a number of the presses, one of which he sold to complainant with a contract by which he agreed to give complainant an exclusive license to use the invention, to procure patents, and gave an option to buy the patent rights. Later, without complainant's knowledge, he contracted to assign the invention to defendant. He afterward entered complainant's employ and with another built a number of presses with improvements. While so employed he filed application on which a patent was subsequently issued and assigned the same to defendant. *Held*, that the agreement to give complainant a license would be treated in equity as a license, and, the invention having then been embodied in concrete form in a machine, the license was effective, and entitled complainant to sell the presses made free from the monopoly of defendant's patent.

2. **Patents ☞212(2)—Assignee takes title subject to prior valid licenses.**

    An assignee of a patent takes title subject to prior valid licenses, whether or not he had knowledge of them.

3. **Patents ☞209(1)—Embodiment of invention in machine is reduction to practice, which will sustain license.**

    The concrete embodiment of an invention in a machine is a reduction to practice, equivalent to the filing of a specification, for the purposes of a license by the inventor.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Patents ⟺214—License to corporation terminates with legal death of corporation.**

A license to a corporation ends with the cessation of its corporate activities preliminary to its legal dissolution.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Keystone Type Foundry against the Fastpress Company. Decree for defendant, and complainant appeals. Reversed. For opinion below, see 263 Fed. 99.

In 1913 one Stonemetz was working over a printing press of his own devising, whereof the meritorious novelty, if any, resided in the normal placing of the cylinder in relation to the bed and the means for producing operative conjunction between them. He had built several machines, kept them at Palmyra, N. Y., and intended to apply for a patent in time.

Plaintiff was a Pennsylvania corporation and a jobber in printers' supplies, including presses. In December, 1913, it executed a written agreement with Stonemetz. By this very inartificial document plaintiff agreed to take one of the Palmyra presses to its establishment in Philadelphia and pay for it—if after 30 days it proved "satisfactory"—and to order the rest of the machines at Palmyra at the same price. The one machine was taken and paid for; the rest were never ordered, nor did Stonemetz ever complain thereof.

The contract also provided for payment of royalties on machines manufactured for plaintiff. Stonemetz further agreed to be diligent in procuring patents, "and to license (plaintiff) to exclusive use of same and to defend (plaintiff) against any claims for infringement of other patents." Plaintiff also for two years from date of agreement had the option of buying "all patent rights" in Stonemetz's press, and Stonemetz agreed to enter plaintiff's employ at a named salary if requested—to stay as long as wanted and apparently devote his time to "advertising and building any other machinery (plaintiff) may desire to have built."

Although taken and paid for, the Palmyra press was not a marketable article: apparently the interoperation of cylinder and bed was attractive, but the actual press did not register well, and, although Stonemetz kept working over his invention, neither he nor plaintiff had produced a commercial article down to the spring of 1915. At that time Stonemetz interested defendant (a New York corporation) in his press, took defendant's representative to Philadelphia, and in plaintiff's factory showed them the Palmyra press with (perhaps) some improvements.

This resulted on May 12, 1915, in a written contract between defendant and Stonemetz, whereby the latter duly agreed to assign to defendant the patent he was to apply for on the machine lately shown to defendant in plaintiff's factory. Of this performance of Stonemetz plaintiff was certainly contemporaneously ignorant. Whether defendant had notice of the relations between plaintiff and Stonemetz we are not sure, but must hold that under the form of this action it is plaintiff's duty affirmatively to show the existence of such notice and plaintiff has not borne the burden of proof on this point. Probably before May 12, 1915, and certainly before September of that year, plaintiff directed one Smith, an employee of its own, to attempt the betterment of the mechanism of the Palmyra press.

On September 9, 1915, plaintiff wrote Stonemetz a letter (approved in writing by the latter) whereby he was immediately employed to work on the mechanical improvements of his press with and under plaintiff's old employee, Mr. Smith. The nature of Stonemetz's work appears from testimony other than the letter of employment. We find that Smith is the man who devised (and subsequently patented) those devices or adjuncts which made out of Stonemetz's press as much of a commercial success as it ever became. The letter of September 9th also sets forth a royalty scheme wholly different from that of the 1913 contract, to which no reference is made in the 1915 writing.

⟺For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On October 7, 1915, Stonemetz by formal assignment, subsequently duly recorded, transferred to defendant the invention embodied in his printing press. On October 11th he filed his application for patent, accompanied by drawings made from a machine belonging to plaintiff, which by that time was actually pushing the construction of some thirty presses with Smith's improvements as they matured. Stonemetz was in plaintiff's pay when he did this. The patent ultimately issued to defendant (No. 1,188,507, June 27, 1916). In 1917 plaintiff decided to cease business and go into liquidation. It then had on hand upwards of 20 presses, the result of the joint labors of Smith and Stonemetz. These were about to be sold in bulk to one customer, when defendant served notice of infringement of the Stonemetz patent. Thereafter plaintiff brought this suit, asking to have declared its right as licensee under the 1913 contract to make and sell the said printing presses. The court below denied such right, and after other proceedings, not (in the view we take of the case) necessary to mention further, dismissed the bill and sustained a counterclaim of defendants, demanding injunction against plaintiff and more particularly (in effect) forbidding any profitable disposition of said 20 machines. From decree accordingly plaintiff appealed.

E. W. Bradford, of Washington, D. C. (William A. Redding and Ambrose L. O'Shea, both of New York City, of counsel), for appellant.

George Scull, of New York City, for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The declaration of law made below rests on a finding of fact as to which we are constrained to differ. The lower court held (263 Fed. 101) that the 1913 contract between Stonemetz and plaintiff had terminated by abandonment before defendant's contract with Stonemetz of May 12, 1915. There is no direct evidence of this, except the statement of Stonemetz. He has been rightly declared by the trial court a man unworthy of belief, and what he said about that contract is no more credible than any of his other statements. Abandonment implies mutual consent; of such mutuality there is no proof at all, and it may be added that the burden of proof in respect of any change of earlier relations between plaintiff and Stonemetz is on the defendant, and it assuredly has not been borne.

[1] The 1913 contract evidences a lawful relation between plaintiff and the inventor; such presumption as exists is in favor of its continuance until it is affirmatively shown to have terminated. We do not discover inconsistencies between the 1913 contract and the letter of September, 1915, evidencing or proving that the earlier agreement had come to an end. On the other hand, it is plain that, if that earlier contract had wholly ceased to exist, plaintiff was in the fall of 1915 vigorously proceeding to perfect Stonemetz's device without any explicit license from the inventor. We therefore conclude in point of fact that the license agreement of 1913 survived, and that the machines now in plaintiff's possession were made on the faith thereof, or in reliance thereon.

It may be said that the 1913 contract does not in terms grant a license; it merely agrees to give one. The result is the same. American, etc., Co. v. Van Nortwick, 52 Fed. 752, 3 C. C. A. 274. Equity

will consider the license as given by the same reasoning as that which held the equitable title to have passed when the intent was to transfer a plurality of patents and one was inadvertently omitted from the writing. Newton v. Buck, 77 Fed. 614, 23 C. C. A. 355.

If in 1913 the specification for Stonemetz's patent had been drawn, and certainly if there had been then a pending application therefor, the patentee's license, even by word of mouth (St. Louis, etc., Co. v. Sanitary, etc., Co., 178 Fed. 926, 103 C. C. A. 565), would have prevailed over a subsequent written and recorded assignment of the entire invention (Jones v. Berger (C. C.) 58 Fed. 1006, citing cases). The familiar basis of the rule is that one devising "a new and useful improvement [is] vested by law with an inchoate right to its exclusive use which he may perfect and make absolute by proceeding in a manner which the law requires." Gayler v. Wilder, 10 How. 477, 13 L. Ed. 504.

[2] It is true that in some ways the rule seems anomalous; but it has passed into one of property clearly understood, and should not be interfered with, except, after due consideration, by statute. The present is an instance of how a dishonest inventor can work injury to several innocent parties; but, when defendant took its assignment, it had long passed into the text-books that such an assignee acquired title subject to prior licenses of which the assignee must inform himself as best he can, and at his own risk. Rob. Pat. § 817; Walker (5th Ed.) §§ 303, 304.

[3] The difference between this case and any previous litigation brought to our attention is that, when Stonemetz gave this license, there was no specification or other written description of his invention in existence. But there was a concrete embodiment of what he had invented in the shape of the Palmyra machine. The reason for the mention of specification or description in previous cases is obviously that, if a man assumes to license or otherwise deal as owner with anything, there must be a thing in existence capable of being dealt with. The specification of a patent is commonly treated as a reduction to practice, but it is assuredly no more such reduction than is the building of a machine of which the specification is a description. We think that Stonemetz's "inchoate right" was as fully expressed by his machine as by any specification, and that he was therefore, in December, 1913, in a position to grant a license.

That he did grant a license, only, results from the fact that he did not in terms or in substance assume to grant all the rights to make, to use, and to sell; anything less than this is a license. But, further, the 1913 agreement specifically contained in another clause an agreement to assign if and when plaintiff desired to "buy" Stonemetz's patent rights. Any contract must be construed, if possible, so as to give force to all its clauses, and the "buying" or conveyance clause of the 1913 contract means nothing, if the license clause be expanded into a conveyance.

[4] For these reasons we hold that plaintiff was well licensed to make and to sell the machines now in his possession. By such license it acquired, as has been well said, the right not to be sued. Heaton, etc.,

Co. v. Eureka Co., 77 Fed. 290, 25 C. C. A. 267, 35 L. R. A. 728. But plaintiff has gone out of business; it has ceased its corporate activities, except for the purposes of liquidation, and is in the process of arriving at a legal death. Under such circumstances its license expired with the cessation of its corporate activity. Haffcke v. Clark, 50 Fed. 531, 1 C. C. A. 570, citing cases. The result is that in our opinion plaintiff has the right to sell the machines it had on hand when it ceased business, or to perfect the sale which was stopped by defendant's notice of infringement.

The decree appealed from is reversed, with half costs, and the cause remanded for further proceedings not inconsistent with this opinion.