**FARRAND OPTICAL CO., Inc.,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

United States District Court
S. D. New York.
July 21, 1959

See also 133 F.Supp. 555.

Pennie, Edmonds, Morton, Barrows & Taylor, New York City, for plaintiff (Willis H. Taylor, Jr., John T. Farley, New York City, of counsel).

S. Hazard Gillespie, Jr., U. S. Atty., for Southern Dist. of New York, New York City, for defendant (John S. Clark, Asst. U. S. Atty., New York City, and Bernard Wohlfert, Atty., Dept. of Justice, Washington, D. C., of counsel).

RYAN, Chief Judge.

This suit was filed on May 5, 1955, under the provisions of The Invention Secrecy Act of 1951, Title 35 U.S.C. § 183; July 19, 1952, C. 950, Sec. 1, 66 Stat. 806; and of The Mutual Security Act of 1954, Title 22 U.S.C.A. § 1758; August 26, 1954, C. 937, Ch. IV, Sec. 506, 68 Stat. 852.

Plaintiff seeks compensation for damage and use of an invention by the Government, under Title 35 U.S.C. § 183, and for unauthorized use or disclosure of the same invention by the Government, under Title 22 U.S.C.A. § 1758.

Plaintiff, Farrand Optical Co., Inc., is a New York corporation organized in 1940. Its principal place of business and its plant has been located in the County of the Bronx, New York, since 1941. Farrand Optical Co., Inc., has been engaged in the design, development and manufacture of optical instruments; including fire control equipment for the military services. The president of the corporation is and has been Clair L. Farrand; the chief engineer during the material period was Robert W. Tripp— the inventor named in the patent involved in this suit.

It is admitted in a stipulation filed before trial that plaintiff was and still is the assignee and owner of the invention in suit, described and claimed in the application for United States Letters Patent of Robert W. Tripp filed August 19, 1946, Serial No. 691,556, for "Hemisphere Sight" by assignment executed August 8, 1946, recorded in the United States Patent Office August 19, 1946 at Liber K208, Page 38, and of the twenty-two (22) claims thereof allowed December 21, 1948, now United States Patent No. 2,719,457, entitled "Scanning Telescope Having Astigmatized Pupil" granted October 4, 1955.

It has also been stipulated that on February 23, 1949, a Secrecy Order was entered by the Commissioner of Patents in this Tripp application for United States Letters Patent as shown at page 105 of the certified file wrapper and contents of United States Letters Patent No. 2,719,457, under the Act of October 6, 1917, as amended: 35 U.S.C. §§ 42–42f; 40 Stat. 394, 54 Stat. 710, 55 Stat. 657, 56 Stat. 370.

We find that this Secrecy Order, entered in the Tripp application, was issued at the direction of the United States Air Force, Commanding General, Office of the Judge Advocate.

It is not in dispute that on December 2, 1954, the Secrecy Order was rescinded under the provisions of Title 35 U.S.C. §§ 181–188 (1952) in respect of the subject matter of the application and of the allowed claims.

It is also stipulated that United States Letters Patent No. 2,719,457 was granted October 4, 1955 on the Tripp application, subsequent to the commencement of this action on May 5, 1955. The patent contains the twenty-two (22) claims allowed.

The plaintiff has also by stipulation agreed that in seeking the relief asked in the complaint under Title 35 Section 183, and under Title 22 Section 1758, it will rely only on the invention defined by claim thirty-two (32) in the Tripp application, now claim four (4) of patent No. 2,719,457. Claim 32 (patent claim 4) reads as follows:

"4. In a telescope having

"(1) an objective,

"(2) an aperture stop, and

"(3) axially separated prismatic scanning elements mounted in front of the objective,

"(4) said scanning elements having their prismatic axes mutually perpendicular and having the prismatic axis of the element closer to the objective disposed perpendicular to the optical axis of the telescope,

"(a) a cylindrical lens interposed between the objective and aperture stop adjacent a plane at which the telescope focuses images of distant objects for astigmatizing the image of the aperture stop produced by the elements of the telescope between the aperture stop and scanning elements,

"(b) said cylindrical lens having its cylindrical axis disposed perpendicular to the axis of the telescope and parallel to the prismatic axis of the element closer to the objective."

The defendant has conceded and admitted for the purposes of this action only the validity and patentability of claim four (4) of the patent No. 2,719,457— allowed claim thirty-two (32) of the application, within the purview of the Patent Act, July 19, 1952.

The defendant has also admitted use of the subject matter of claim "4" of the patent in suit in "Hemisphere Gunsights and Vertical Periscopic Bombsights" procured by it under certain specified contracts made by it with parties other than plaintiff.

Thus, the questions of validity and of infringement (or better, employment and use, for the defendant contends that the application and employment of the invention was under circumstances not entitling plaintiff to recover for infringement) have been conceded by the defendant, and have been eliminated as factual issues. All of these admissions have been set forth in a pre-trial stipulation.

It should be noted, too, that this is not a patent suit for infringement. Suit was filed and issue joined, prior to the issuance of the patent on October 4, 1955. The claims here asserted are for compensation for use and disclosure.

There was a further pre-trial stipulation by which the issues to be tried were stated and in which it was recognized that these issues fell within one of two groupings—(1) the right of the plaintiff to recover just compensation under Title 35 U.S.C. § 183 and Title 22 U.S.C.A. § 1758 (which we have referred to on trial as the issue of liability of the defendant, if any, on the claims here asserted);

and (2) in the event of a determination of this issue in favor of the plaintiff, the amount of such compensation. For the orderly presentation of the evidence, the Court, with consent of counsel, has tried first the issue of liability; and it has been understood that, if required, the trial shall be continued, after this determination, as to the remaining issue— the amount of just compensation due to the plaintiff. We set forth our findings and conclusions only as to the liability of the defendant on the claims asserted.

A proper understanding of the plaintiff's claims requires that we briefly consider the relations and dealings of the plaintiff with the various military services prior to the filing of the application for the patent in suit.

In early 1941 the plaintiff Farrand received from the Department of the Navy facilities which included a four-story industrial building, together with machinery, tools and sundry equipment suitable for the manufacture of optical instruments. This plant and equipment was to be used primarily for Government contracts but Farrand was authorized to use the facilities for private, non-Government business upon the payment of a charge.

Plaintiff on June 22, 1942 entered into a contract with the Navy Department for the manufacture of approximately four hundred Mark 33 periscopes (gunsights) for use as a part of a fire control system for directing and controlling the vertical axis machine gun turrets on an airplane. The Mark 33 Gunsight was essentially two single-end periscopes placed end to end. These sights were double-ended, vertical, periscopic and capable of scanning a hemisphere either above or below the airplane fuselage. They furnished azimuth and elevation information in polar coordinates for use in driving upper and lower gun turrets. The position of the line of sight of the sighting station both in azimuth and in elevation was converted into signal voltages by the azimuth and elevation selsyn generators on the sight. One, the azimuth, rotated with the sight about its vertical axis;

the other, the elevation, rotated in accordance with rotation of the elevation prism; both were transmitted to the machine gun and turret being controlled. The gunner could sight through either the upper or lower end of the Mark 33 sight, but only through one end at a time. The gunner operated the sight by two rotatable control grips, one for each hand mounted on a horizontal shaft; the grips rotated the elevation prisms. The changeover from one head to another, lower to upper telescope, or vice versa, required but a half second and to avoid frequent changeovers when tracking a target substantially on the horizon the changeover was provided with an overlap. The upper head covered elevation from the zenith to a few degrees below the horizontal, and the lower head covered elevation angles from the nadir to a few degrees above horizontal. Mounted for unlimited rotation about its vertical axis, the sight could be turned around in azimuth to the right or left in complete 360-degree circles or any part thereof. The gunner's seat was mounted on a circular track around the sight unit; the gunner rotated the sight and his own body by the movement of his feet upon the compartment floor.

But it was found that the fire control equipment which included the Mark 33 sight in combination with the General Electric Amplidyne and turret control system was not practical for the Navy planes. In the latter part of 1943, the Navy served notice that it would terminate the Mark 33 procurement program. In an endeavor to find a new source of business Clair L. Farrand and Robert W. Tripp visited Wright Field, Dayton, Ohio, the wartime center of Air Corps procurement and development. They took with them a Mark 33 sight and attempted to interest the Air Force in the production of that sight by plaintiff.

The Air Force procurement were having difficulties obtaining deliveries from their sources of supply; they thought that the Mark 33 sight would fit into the fire control system for the airplane they were producing. The mission to Dayton

was accomplished with success and the plaintiff entered into a contract dated December 24, 1943, with the Air Force (W33–038–ac–1742) for the Mark 33 sights. By August 1945, after V-E Day, when the contract was cancelled, plaintiff had delivered a total of 571 Mark 33 sights for an amount of about $6,800,-000.

On September 22, 1943, while Farrand and engineer Tripp were at Wright Field discussing aspects of the Mark 33 contract then being negotiated with the Air Force, they had occasion to meet James V. Burke, an engineer engaged in the development of fire control equipment for the Air Corps at its Armament Laboratory at Wright Field. Burke was responsible for the development of fire control systems on a number of bombers, including the B–29. He told Farrand and Tripp that he was seeking a new sight for the nose position of the B–29; that he sought a sight which would scan through a lateral hemisphere and which would furnish azimuth and elevation information in polar coordinates for use in directing the fire from the nose of the plane. He explained that what he had in mind was a sight which would be different from the Mark 33 in that one might look through it out of the side, nose or tail of an airplane and with a large angle of visual view, be able to scan an entire hemisphere bounded by a vertical plane in the wall of the airplane, and at the same time control the gun turrets in the airplane which would have a vertical axis of rotation. The solution to the problem with which Burke was confronted (as he expounded it to Farrand and to Tripp and as they correctly understood it) lay in devising a sighting apparatus which would in effect put the gunner's eye immediately outside the skin of the airplane and provide him controls by which the gunner could orient a line of sight on enemy targets as they came toward him in the nose position. Such a sight would be one that operated on azimuth and elevation coordination and would move in the same coordinate systems as the firing turret, so that the motion and the measure of that motion would be the same as the measure of motion in the turret.

Burke had discussed the problem of such a sight with two prominent optical companies but neither of them could offer a solution of the problem.

Upon returning to New York, Farrand opened plaintiff's factory order No. 4917 dated September 30, 1943, to implement work on the problem and calling for work on and development of a "Fire Control Telescope." Tripp, and others of the Farrand technical staff, made several suggestions and some small models were built to demonstrate the principles, but none were suitable.

In the development, it was recognized that correspondence in azimuth and elevation coordinates could be achieved by the use of two double dove prisms arranged to rotate at right angles to each other in front of a telescope. This, however, would require that at least one of the prisms be of substantial size; the difficulty was that such a large prism would not conform to the limitations imposed by the environment of use in an airplane.

Tripp's approach to the problem had led him to conclude that if the elevation prism in a two prism system were made to follow the line of sight so that its axis was always normal to the deflected optical axis of the sight, the coordinate system requirements would be met and at the same time the prism generally would be centered on the field of view. Thus, rotation of the prism nearest the objective of the sight about a vertical axis combined with the rotation of the elevation prism in a cradle around the same axis, with a two-to-one ratio in the motions, the cradle moving twice as fast as the azimuth prism, would produce a pure azimuth motion and rotation of the elevation prism in its cradle would produce a pure elevation motion and the system would have the desired polar coordinate axis, normal (perpendicular) to the principal axis of the sight with independence of information as respects azimuth and elevation deviation, respectively. However, with such a system it seemed that

the transmission of a wide field of view without one prism of large size seemed impossible. After exploring various possible solutions Tripp concluded, however, that this system was the only one that appeared to have the correct coordinates.

While Tripp was considering the problem of getting the field through the prisms, it occurred to him that there had been imposed a restriction which was not completely necessary—that the entrance pupil need not lie within the prism and that such a restriction was necessary only in a plane normal to the axis of the prism. Since the two prisms were at right angles to each other the condition could be satisfied in both prisms simultaneously by astigmatizing the entrance pupil. (The entrance pupil of a sight is the image of the aperture stop or stops of the sight formed by all of the optical elements between it and such stop.)

Tripp, finally, with the spark of inventive genuis, suggested the use of a cylindrical lens in the objective system of a telescope which would have the effect of splitting the entrance pupil and causing it to lie in two focii, one in each of the prisms. This permitted the use of small prisms without requiring a reduction in size of the entrance pupil and the consequent reduction in angle of view. This is the invention in suit.

From the time of the initial shop or factory order of September 30, 1943, there issued in the course of the study and development numerous and additional similar orders; there were as well drawings and various parts and assemblies designed and fashioned. Sometime between January, 1944, and April, 1944, Tripp's idea was embodied in a mock-up and the parts and assemblies he finally selected were put together in a single apparatus constructed in the Farrand factory. An exact reproduction of the original mock-up which was broken is in evidence as Plaintiff's Exhibit 9 and we have inspected, carefully examined and personally operated it.

The mock-up consisted of a telescope composed of the optics of a Mark 33 sight to which was added a cylindrical lens and two aspheric lenses. The telescope was of folded design and was housed in a wooden box. Attached in front of the lens system of the telescope were two rotating prisms for scanning in elevation and in azimuth. The prism for scanning in elevation was mounted in a cradle rotatable about the longitudinal axis of the azimuth scanning prism. A gear drive was provided with a stub shaft, rotation of which caused a simultaneous rotation of the azimuth prism and the cradle about the longitudinal axis of the azimuth prism, the cradle rotating at twice the angular speed of the azimuth prism.

Provision was made for effecting rotation of the elevation prism by manual operation.

We have noted that the device was inspected and operated during trial. It was placed on a windowsill from which point objects were viewed by manually rotating the elevation prism and the stub shaft. With the eye in the exit pupil (a position located several inches from the observing end of the telescope), we were able to scan a full field and to observe distant objects. None of the objects observed were located in terms of azimuth and elevation coordinates for the device had no measuring means, and no reticle.

In April, 1944, the apparatus or mock-up was shown to and inspected by a Lt. Goldmann of the Air Corps while he was at plaintiff's plant in connection with the Mark 33 sight. He observed that when the prisms were moved it covered a line of sight through a very large angle. At Wright Field later, Lt. Goldmann again looked through the apparatus and stated that neither in the Air Force Laboratory nor elsewhere he ever looked through any instrument that gave such a view in extent, as to area and cone of vision. In reporting to the Air Force Laboratory, he referred to the mock-up as "a novel device."

Thereafter, Farrand exhibited the mock-up at Wright Field. Burke was of the opinion that the device had prom-

ise for use and indicated he would recommend the award of a development contract. The contracting division was requested to negotiate such a contract with Farrand.

On April 20, 1944, Burke telephoned Farrand advising that the General Electric Company would contact plaintiff. The purpose of the visit was to investigate the possibility of incorporating the sight (Plaintiff's Exhibit 9) in some of the airplane fire control equipment the General Electric Company was manufacturing. Thereafter, on April 24, 1944, R. A. Averitt of the General Electric Company visited plaintiff's plant and Plaintiff's Exhibit 9 was shown to him as it had been to Lt. Goldmann. Averitt was impressed with its operation and discussed with Farrand its possible use in several aircraft.

On May 9, 1944, the Air Force Armament Laboratory at Wright Field wrote plaintiff, stating in substance:

"A favorable report has been received from representatives of the General Electric Company, after having inspected the mock-up of the periscope, toward further investigation and test of the periscope with a General Electric fire control system. From the viewpoint of the Materiel Command it would be most desirable to regard the periscope as an integral part of the particular fire control system, and it is suggested that your company contact the General Electric Company to supply such a periscope in fire control systems that company is supplying the Army Air Forces."

The letter also

"requested that if possible your mock-up of the periscope be sent to the Armament Laboratory, Engineering Division, of the Materiel Command, Attn.: Mr. J. H. Sproule, for further demonstration to personnel of the Materiel Command."

Farrand, by letter of May 19, 1944, agreed to bring the apparatus to Wright Field as requested. Farrand did so and demonstrated it to Mr. Sproule and others in the Fire Control Section of the Armament Laboratory on May 24, 1944.

On September 19, 1944, the Air Force requested plaintiff to permit Dr. I. C. Gardner of the National Bureau of Standards to inspect and discuss the hemisphere sight on about September 21, 1944. Dr. Gardner at that time was Chief of the Optical Section of the National Bureau of Standards and was a man of great repute and an authority in the optical field for many years. The demonstration of the apparatus was made to Dr. Gardner. Dr. Gardner operated the apparatus and said it was an unusual device, quite remarkable, but that he did not understand how such a wide field could get through such a small pair of prisms. Farrand explained that Tripp had provided a cylindrical lens to astigmatize the pupil. Dr Gardner said it was a very excellent idea and praised the operation of the apparatus.

On December 15, 1944, the Air Force advised plaintiff by letter (in Plaintiff's Exhibit 10):

"1. The Air Technical Service Command has under development several new types of airplanes for which it appears that the Farrand sight is most suitable. In order that information concerning the size, shape, and required installation may be available to the aircraft companies for mock-up purposes, it is requested that the Farrand Optical Company prepare an outline drawing of the hemisphere sight. It is recognized that the design of this instrument is in a preliminary stage and, therefore, at a state when information is not available for preparation of an accurate installation drawing. However, a drawing of approximate size which your company may feel free to modify at a later date would be very helpful in showing in the airplane mock-ups approximately what the sight will look like and how it will function with the other gunnery equipment."

On December 28, 1944, the Air Force at Wright Field requested plaintiff to discuss the hemisphere sight with a J. L. Ledeen, an engineer of the General Electric Company, supervisor of engineering work in the construction of fire control equipment. Mr. Ledeen sought information concerning a possible supply by plaintiff to General Electric Company of hemisphere sights; plaintiff agreed to supply this information.

On January 16, 1945, plaintiff wrote the Air Force Armament Laboratory, in reply to a telegraphic request, transmitting data on the hemisphere sight of Plaintiff's Exhibit 9. It enclosed a description entitled "Optical Principles of the Hemisphere Sight" which was a technical description of the optical and mechanical elements peculiar to the hemisphere sight. The letter concluded "Should you find this device useful, we would be glad to discuss with you a royalty arrangement to cover the use of the inventions in production." This letter was personally delivered by Farrand and with it the mock-up.

Following this, it appears that no other development source was engaged by the Air Force but that there ensued considerable correspondence and some conferences between Farrand and representatives of the Air Force concerning payment by the Air Force to Farrand of royalty compensation for use of the invention. Finally, on March 26, 1945, plaintiff advised the Air Force that the tendered contract was acceptable. A research and development contract W 33 (038) ac–6296, dated March 10, 1945, effective on April 7, 1945 was executed, calling for the fabrication of one experimental model of a hemisphere gunsight for the XB–45 airplane and the preparation of drawings thereof. It was a "Cost-Plus a Fixed-Fee Supply Contract," in which the plaintiff undertook to complete the contract within ten months, at an estimated cost of $146,335 plus a fixed fee of $5,853.40.

It is important here to note that "Article 30—Reproduction and License Rights" of this contract of March 10, 1945 (Plaintiff's Exhibit 13) contains two separate paragraphs entitled Clause (a) and Clause (b).

Clause (a) of Article 30 provided:

"The Contractor agrees to, and by the execution of this contract does, grant, sell and convey to the Government, a non-exclusive irrevocable and royalty free license (a) to make, have made, use for all Governmental purposes and sell or otherwise dispose of in accordance with law, any and all articles of the type made or developed by the Contractor in the performance of this contract and any modifications or improvements thereof hereafter made, under any and all patent or other rights now or hereafter owned or controlled by the Contractor or under which the Contractor has the right (without obligation to make payment to others) to grant licenses * * * except that as to the right referred to * * * the license herein granted shall be limited in term to the duration of hostilities in any war in which the Government is now engaged plus six (6) months thereafter * * *."

█ By this Clause (a) reproduction rights in the hemisphere sight were granted to the Government for the duration of the war and "six (6) months * * *". It expired on March 2, 1946, six months after the surrender of Japan on September 2, 1945 (Breese Burners, Inc. v. United States, 121 F.Supp. 530, 536, 128 Ct.Cl. 649).

Clause (b) of Article 30 provided:

"The Contractor agrees to, and by the execution of this contract, does grant, sell and convey to the Government a non-exclusive irrevocable and royalty free right and license (b) to practice and cause to be practiced, and to make, use, and sell articles embodying, any and all discoveries, inventions or improvements made, or first reduced to practice by the Contractor, its representatives or employees in the performance of this

contract under any and all patent or other rights based upon such discoveries, inventions or improvements."

It was also provided in "Article 28—Reproduction Rights" that

"It is understood and agreed that the Contractor does not convey to the Government any reproduction rights in or to the articles and/or spare parts called for herein by virtue of the terms of this contract unless herein otherwise specifically provided."

"Article 30A—Special Reproduction Rights" of the contract provided:

"The Contractor hereby grants to the Government the right to reproduce, use and disclose for all Governmental purposes any and all reports, drawings, blueprints and data to be delivered by the Contractor to the Government under the terms of this contract."

This "Article 30A", as its title "Special Reproduction Rights" indicates, granted no reproduction rights in the hemisphere sight, but did grant reproduction rights in respect of reports, drawings and blueprints, nothing more.

The Air Force exhibited plaintiff's apparatus (Plaintiff's Exhibit 9) to Eastman Kodak and caused it to be taken to the Eastman Kodak plant in Rochester, New York, in January 1945. Later, and on December 3, 1945, and while the Government's time-limited royalty-free license under Article 30 of the contract of March 10, 1945 had not expired, plaintiff by letter sought permission of the Air Force Armament Laboratory for plaintiff's personnel to meet with Kodak representatives and to exchange design information in respect of the hemisphere sight. After the expiration of the said time-limited license the relations of plaintiff and Eastman Kodak were continued at the express directions of the Air Force.

In August of 1947 production of airplanes in which it was proposed to use the hemisphere sight had progressed to the point where it became apparent that the Farrand Optical Company would be incapable of supplying the Air Corps needs for sighting equipment and that consequently an alternate source would have to be established. In August of 1947, a meeting was held at Wright Field attended by Farrand, Eastman Kodak, General Electric and Air Corps personnel at which time it was suggested that Eastman be set up as a second source. Farrand concurred in this suggestion and subsequently assisted in the project by supplying Kodak with copies of its drawings, and in the establishment of Eastman in the program through a close collaboration of its engineering staff with the engineering staff of Eastman. Under this policy of cooperation the two companies exchanged information, so that ultimately the production parts of the two companies were almost interchangeable.

Plaintiff's letter to the Air Force of January 16, 1950, briefly reviewed the matter stating:

"The Farrand Optical Company, Foci, was advised by AMC that the Eastman Kodak Company, Kodak, was desired as a second source of supply for the Hemisphere Sights and Periscopic Bombsights to be made in accordance with designs originated by Foci.

"Foci advised AMC that it thought Kodak the best choice for a second source and that it would cooperate fully * * *."

Air Force replied by letter of January 24, 1950 (in Plaintiff's Exhibit 15):

"It is believed that Farrand Optical Company is fully cognizant of the circumstances surrounding the introduction of a second source in the hemisphere sight and periscopic bombsight field as this matter has been the subject of numerous discussions in the past. You are undoubtedly aware of the serious predicament with which this nation would find itself in the event of an emergency if the full requirements

of the Air Force for sighting equipment were available from one source capable only of limited production (the Farrand Optical Company). The Air Forces have been dependent upon the Farrand Optical Company for the past several years * * *."

"Your cooperation in bringing a second source into production has been recognized and is sincerely appreciated. Continued close collaboration between Eastman Kodak and Farrand on the items of mutual interest is urged.

"Your contribution to the field of sighting development has been outstanding."

Defendant admits use of Plaintiff's Tripp patent (No. 2,719,457) claim 4 (allowed application claim 32) in hemisphere gunsights and vertical periscopic bombsights procured by it pursuant to the following contracts with others than plaintiff:

(a) W33–038ac20718, dated February 3, 1949.

(b) W33–038ac22041, dated February 18, 1949.

(c) Purchase order AOSA 120, dated July 26, 1949, based on W33–038ac11420.

(d) Purchase order AOSG 72431, dated March 31, 1951, based on AF33(038)–8510.

(e) AF33–(038)–14792, dated January 4, 1951.

(f) AF33(038)–14797, dated February 14, 1951.

(g) Purchase order 57893, dated July 21, 1951, based on AF33(038)459CPff.

(h) Purchase order 57900, dated August 24, 1951, based on AF33(038)21096.

(i) Purchase order SC57897A, dated December 17, 1952, based on W33–038ac–20568.

(j) Purchase order C5–47580k, dated February 20, 1955, based on AF33(038)–21096, and AF33(600)22119.

(k) Purchase order C5–60118–PA, dated August 9, 1955, based on AF33–(600)29498.

(l) Purchase order E104421–8, dated November 2, 1955 (Government contract not designated).

(m) Purchase order E104535–8, dated January 16, 1956, based on AF33(600)–31100 and 32004.

(n) Purchase order C5–75104PA, dated February 6, 1956, based on AF33–(600)31451.

(o) Purchase order E117801, dated May 21, 1956 (Government contract not designated).

(p) Purchase order E86798, dated June 9, 1956, based on AF33(038)21096.

(q) AF33(600)–32004, dated June 30, 1956.

(r) Purchase order K–86094–PA, dated August 3, 1956, based on AF33(600)–32624.

(s) Purchase order KZ–86148–PA, dated September 19, 1956, based on AF-33(600) 33648.

(t) Purchase order K88059, dated October 17, 1956, based on AF33(600)–22119.

(u) Purchase order K–1051–PA, dated February 4, 1957, based on AF33(600)–34262.

(v) AF33(600)34235, dated March 9, 1957.

(w) Purchase order E132548, dated April 18, 1957, based on AF33(600)32004 and 34235.

(x) Purchase order K–18577, dated April 24, 1957, based on AF33(600)–34262.

(y) Purchase order K–18578, dated April 24, 1957, based on AF33(600)–34215.

(z) AF33(600)35487, dated June 7, 1957.

The hemisphere gunsights and vertical periscopic bombsights procured by defendant pursuant to said contracts are described in one or more of the following Air Force Technical Manuals, Hand-

books and Parts Catalogs published by defendant in respect of hemisphere gunsight (B–36) and the Y-series bombsight periscope, as follows:

(h) Handbook—Periscopic Gunsight Type AA–1 (Farrand, Eastman) dated August 15, 1950.

(i) Handbook—Hemisphere Sighting Station, Models 2CSH4A3 and 2CSH6E1 (General Electric) dated March 15, 1951.

(j) Parts Catalog—Hemisphere Sighting Station, Model 2CSH4A2 (General Electric) dated March 26, 1951.

(k) Handbook—Hemisphere Sight, Model 2CSH4A2 (General Electric) dated June 15, 1951.

(l) Parts Catalog—Hemisphere Sighting Station, Models 2CSH6E1 and 2CSH-4A3 (General Electric) dated July 30, 1951.

(m) Handbook, Bombsight Periscope Type Y–1, etc., prepared under Contract W22–038–ac–17135 dated January 1949.

(n) Introduction and Description (Preliminary) Vertical Periscopic Bombsight Type Y–1, dated September 1950.

(o) Handbook Overhaul Instructions—Vertical Periscopic Bombsight Type Y–1 (Farrand Optical Co.) dated December 22, 1950.

(p) Parts Catalog—Vertical Bombsight Type Y–3 (Eastman Kodak) dated May 15, 1951.

(q) Parts Catalog—Vertical Periscopic Bombsight Type Y–3 (Farrand Optical Co.) dated September 15, 1951.

(r) Parts Catalog—Vertical Periscopic Bombsight Type Y–3 (Farrand Optical Co.) dated March 15, 1952.

(s) Handbook Overhaul Instructions—Vertical Periscopic Bombsight Type Y–3 (Farrand Optical Co.) dated June 16, 1952.

The following drawings of Eastman Kodak Company (in Plaintiff's Exhibit 18) are among those under which the said hemisphere gunsights and vertical periscopic bombsights were manufactured pursuant to the said contracts and said purchase orders listed above which were procured and used by defendant, namely:

Eastman Kodak Company drawings of B–36 hemisphere gunsights numbers:

| | | | |
|---|---|---|---|
| (a) | 910076 | (h) | 991224 |
| (b) | 910590 | (i) | 991783 |
| (c) | 910764 | (j) | 991784 |
| (d) | 920373 | (k) | 993339 |
| (e) | 920500 | (l) | 993446 |
| (f) | 920501 | (m) | 993500 |
| (g) | 991100 | (n) | 920141 |

Eastman Kodak Company Y-series Bombsight Periscope drawings numbers:

| | | | |
|---|---|---|---|
| (a) | 910548 | (k) | 982672 |
| (b) | 920119 | (l) | 984011 |
| (c) | 920125 | (m) | 984015 |
| (d) | 920461 | (n) | 984033 |
| (e) | 920462 | (o) | 984039 |
| (f) | 920490 | (p) | 984044 |
| (g) | 920491 | (q) | 987366 |
| (h) | 920458 | (r) | 991104 |
| (i) | 920560 | (s) | 991113 |
| (j) | 922736 | (t) | 99114 |

The Air Corps was not informed of the filing of the application for a patent by Robert W. Tripp on August 19, 1946, which proceeded on a normal course of examination in the Patent Office culminating in the allowance of 22 claims and the issuance of a notice of allowance on December 21, 1948. On January 24, 1949, Farrand addressed the following letter to the Commissioner of Patents:

"Request for Withdrawal of Notice of Allowance and Imposition of a Secrecy Order

"Honorable Commissioner of Patents

"Washington, D. C.

"Sir:

"The above-identified application was allowed with twenty-two (22) claims by a Notice of Allowance received therein dated December 21, 1948.

"The inventions disclosed and claimed in this application relate to the subject matter of certain existing and prospective Government contracts, as follows:

"(a) Subcontract under General Electric Company's Letter Contract

W33–038 ac–11420 for 103 Hemisphere Sights for B–36 Plane.

"(b) Subcontract under Emerson Electric Mfg. Company's Prime Contract W33–038 ac16986 for 13 Hemisphere Sights for B–45 Plane.

"(c) Subcontract under Sperry Gyroscope Company's Letter Contract W33–038 ac–17135 for 13 Y–1 Bombsight Periscopes.

"(d) U. S. Air Force Prize Contract W33–038 ac–21773 for 17 Hemisphere Sights for B–45 Plane.

These contracts involve applicant's assignee, Farrand Optical Co., Inc., of Bronx Blvd. and East 238 Street, New York, New York, and the U. S. Air Forces. Certain of these contracts are (or will be) classified confidential and impose upon applicant's assignee an obligation not to disclose the subject matter thereof.

"Farrand Optical Co., Inc. is the assignee of the entire right, title and interest in and to the above-identified application by virtue of an assignment executed August 8, 1946 and recorded in the Patent Office on August 19, 1946 at Liber K208, Page 38.

"Applicant's assignee therefore calls the above facts to the attention of the Commissioner and requests that appropriate action be taken under the statute to withdraw the present Notice of Allowance and place the application under Secrecy Order.

"In view of the requirement under R.S. 4885 that the final fee herein be paid on or before the due date, unless the application is withdrawn from issue prior to June 21, 1949, a prompt decision upon the within request is sought.

"Respectfully,

"FARRAND OPTICAL CO., INC.
"By (Signed) C. L. Farrand
"C. L. Farrand,
President.
"January 17, 1949
"New York, New York."

On February 24, 1949 the Commissioner issued a Secrecy Order which remained in effect until December 2, 1954.

Upon receipt of the Secrecy Order Farrand immediately made a claim for compensation as provided by the Patent Secrecy Order. After protracted and fruitless negotiations with the Air Force during the course of which Farrand made demands for payment, this suit was commenced.

The plaintiff has recognized, and stipulated that it is in no event entitled to compensation prior to March 2, 1946 (which is six months subsequent to the cessation of hostilities on September 2, 1945).

■■■ It is the Government's contention that it had an express license royalty-free to use the idea and conception of the Tripp patent under the provisions of "Article 30" of the Development contract with Farrand of March 10, 1945. There it was provided under Clause b, as we have noted, that the Government was granted a non-exclusive, irrevocable, royalty-free license to practice, make, use and sell articles embodying "any and all discoveries, inventions or improvements made, or first reduced to practice" in the performance of the contract. To bring itself out of the operation of this provision, the plaintiff must establish (and has the burden of establishing) that the invention described in Claim "4" of the patent in suit was reduced to practice prior to March 10, 1945. The Government contends that it was not and that it was reduced to practice during the course of the performance of the development contract. It is to this factual issue we now give our attention.

It is the Government's position that since the invention was intended to be used in an airplane as a sighting device in connection with a fire control system, its effectiveness and practicability for that intended use was required to be established in that setting and environment before it could be said to have acquired the status of an invention—that is of a conception which had been reduced to practice. The Government con-

cedes, and it is obvious, that the mock-up, Plaintiff's Exhibit 9, corresponds to Claim "4" of the patent; but the Government argues that this was a mere physical embodiment of the mental concept— or idea—and the mock-up failed to establish the usefulness of the idea for the intended use. Expressed in other terms, the Government urges that the mock-up was simply an article which demonstrated the optical principles employed in the conception but that it was "far from an operative sight" which could be employed on military air craft.

We find that the invention had no practical use other than on airplanes and for military purposes as a part in a gunsight or bombsight. The patent application states no other purpose and suggests no other use. Zenith Radio Corp. v. Lehman, D.C., 121 F.Supp. 69, 2 Cir., 217 F.2d 954. When we test whether the invention was reduced to practice in the mock-up, we must do so against the representation that it was offered only as a hemisphere sight, with special qualities as to a large field of vision, operating in a system of coordinates identical to the "Mark 33" sight, and suitable for incorporation in a complete assembly which would comprise an entire fire control system. It was never intended by Tripp, stated by Farrand, or understood by the Air Force that either the mock-up, or the invention represented, was in itself complete and ready for installation in the nose or side of an airplane as a fire or bombing control system. Jungersen v. Baden, 2 Cir., 1948, 166 F.2d 807, affirmed 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235, rehearing denied 336 U.S. 932, 69 S.Ct. 736, 93 L.Ed. 1092. It was presented as a part—novel and important— which would answer the pressing and urgent need of the Air Force as that need had been explained by Burke and others to Farrand and Tripp. After it was inspected, examined and operated, the invention was found by these men skilled in the art to be a satisfactory answer and a solution to the problem the Air Force could not resolve. Nothing more is required to constitute reduction to practice, and more could not be asked for or expected of an inventor. There was nothing conjectural about being able to look through plaintiff's device and being able to scan a 180° hemisphere. What the Air Force was searching for had reached its point of consummation in plaintiff's device. Coffin v. Ogden, 18 Wall. 120, 85 U.S. 120, 21 L.Ed. 821.

The plaintiff, in its letter to the Air Force under date of April 19, 1944, described the product as a "Panoramic Periscope Having Line of Sight Perpendicular to Azimuth Axis". The mock-up was offered to those skilled and learned in the art as of a "temporary and rough nature" but demonstrative of the claim that "with horizontal line of sight a 76° field could be swung through 180° elevation and 180° of azimuth". We find that it did meet these representations and could be so operated.

It is hornbook that "the inventive act consists of two steps, the conception or birth of an original idea, and its reduction to practice" (Stub v. United States, 63 F.Supp. 748, 749, at page 749, 105 Ct. Cl. 397). Writing of reduction to practice, the Supreme Court has noted (Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 383, 48 S.Ct. 380, 387, 72 L.Ed. 610):

"A machine is reduced to practice when it is assembled, adjusted and used."

That refinements in construction and additions at considerable expense and time were later made and that tests under actual service conditions were not then possible with the original mock-up not built into a completed fire control system, did not delay or postpone the date of actual reduction to practice. It was a "completed successfully operative instrumentality" (Armstrong v. DeForest, 280 Fed. 584) when it was disclosed to Lt. Goldmann on April 15, 1944, and to Air Force personnel on the several occasions in early 1944 and 1945. This was recognized by defendant when the Air Force requested plaintiff to contact General Electric to arrange to supply the sight for incorporation into the firing

system being developed by that company and when it determined without further testing by plaintiff to order construction of these gunsights in accordance with plaintiff's instructions and drawings. Ocumpaugh v. Norton, 25 App.D.C. 90, 1905 D.C. 632, 115 O.G. at 1815; Greene v. Beidler, 2 Cir., 58 F.2d 207. No actual tests in flight were had until 1948 when the contract had been in effect three years. That plaintiff recognized the mock-up as a reduction to practice is evidenced from its correspondence of January and February 1945 wherein it so stated and demanded royalty payments for the use of the "invention". That mechanical improvements were necessary to perfect the device for its intended use and increase its efficiency did not impair the fact that the mock-up in its crude state demonstrated utility and practicality. Burson v. Vogel, 29 App.D. C. 388; 1907 D.C. 669. As Judge Learned Hand wrote in Sinko Tool & Mfg. Co. v. Automatic Devices, Corp., 2 Cir., 157 F.2d 974, at page 977:

" * * * a test under service conditions is necessary in those cases and in those only, in which persons qualified in the art would require such a test before they were willing to manufacture and sell the invention, as it stands."

Not only does the mock-up (Plaintiff's Exhibit 9) embody each and every element of Claim "4", but it performs the functions claimed and set forth, and contains full-sized components arranged and set in practical and working relationship. In short, it is an apparatus which performs the functions claimed for it and in the manner claimed. The Air Force found it to be workable in itself as a sight which enabled one to scan a vertical hemisphere with a wide field of vision with the use of prisms which rotated in a coordinate system identical or similar to the polar coordinate system employed in fire control systems in aircraft. It was recognized by both plaintiff and defendant that the problem of incorporating the sight in a fire control system in a plane was not solved by the mock-up but

they also found it probable that, by further development, it could be so incorporated. The development contract was awarded to Farrand on such an appraisal by the Air Force, after calling in those expert in the art. This appraisal was justified by the fact that a sight embodying "Claim 4" was ultimately incorporated in a complete fire control system assembly produced by the Air Force.

The evidence establishes that plaintiff's invention was embodied in physical form—the mock-up—which showed every essential feature as defined in "Claim 4" and which demonstrated the practicability and utility of the invention, and that this was realized by plaintiff and acknowledged by defendant. Interference Law and Practice, Rivise and Caesar (1940 ed.), Sec. 132, p. 396.

That the mock-up did not include a protective device to cover the prisms and mechanism of the sight which projected beyond the skin of the plane, is of no moment in light of what was known in the art of the manufacture, construction and use of such coverings. All recognized that protection, probably of plastic, and certainly transparent, was required in the final product; its use and construction were not new; only problems of details of design were presented. The requirement of but minimal protrusion beyond the skin of the plane (as compared with the protruding periscopes of the "Mark 33") had been satisfactorily met by the mock-up.

No difficulty was presented by the fact that the mock-up did not include a reticle. This was answered by application of what was well known and elementary knowledge in the art.

The mechanical means for the driving and controlling of the prisms was readily supplied by installation of shafts. The elevation prism had been mounted on a cradle which, when manipulated, revolved about the axis of the azimuth prism at twice the rate of rotation of the rotation of the azimuth prism; and mechanism was provided to produce the simultaneous rotation of the prisms at this relative rate of motion. This met

the requirement that the axis of the elevation prisms should always be perpendicular to the line of sight (because of the scientific fact that light that is reflected is deviated by twice the angle of incidence).

The removal of backlash, of internal fogging from humidity, of dirt and dust clouding the lens, of the effects of plane vibration, were accepted by the Air Force as matters to which answer was available by what was known in the art. The gear and angular measuring and the transmitting means would measure the elevation and azimuth prism angles were never represented by Farrand to be included in either the conception, invention or mock-up but were to be provided by other known means and devices; and all so understood at all times. Also the fact that the mock-up did not have means to compensate for ballistic variances, for gravity, or lead to allow for angular correction to the gun line axis to allow for the motion of the target was obvious. At no time were any of these matters regarded as destroying the essential use, operation or worth of the invention as demonstrated by the mock-up; the answers to these matters rested in the known art and its application.

These improvements while necessary to the effective operation of the mock-up as part of the firing system of a plane, represented the work of artisans, not that of inventors, and but served to perfect the crude invention. The fact that without the improvements plaintiff could not or would not have sold the sight commercially is not dispositive of invention in the face of the determination by persons competent in the field that the device was sufficiently ready for the production contemplated. Sinko Tool & Mfg. Co. v. Automatic Devices Corp., supra; Hildreth v. Mastoras, 257 U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112.

More persuasive than all else of the fact that the conception was reduced to practice in the mock-up is that the mock-up presented in workable and usable form what the Government has called "the real novelty of the device"—that is, the invention stated in "Claim 4". The use of it demonstrated that two small prisms could be employed in the sight and that inserting an astigmatizing cylindrical lens at the focal plane, the entrance pupil was placed in two different loci with respect to the vertical and horizontal lines and that by locating the prisms at these loci, the line of sight could be moved in elevation and in azimuth. Nothing more is claimed by Tripp or Farrand.

While reduction to practice is a determination of fact and there is not much help to be derived from a comparison of cases, the defendant relies heavily, as authority for the necessity of testing under the environment in order to reach a reduction to practice, on Radio Corp. of America v. International Stand. Elec. Corp., 3 Cir., 232 F.2d 726, and Learned v. Thompson, 39 CCPA 730, 191 F.2d 409. The decisions in those cases did rest on a finding that there had been no actual test on an airplane or ship for a radar device in the one and on the sea for a flash distress signal in the other. The facts are not parallel to ours, however, for, in R.C.A., there was just no evidence of the device claimed to have been a prior invention, no physical embodiment or contemporaneous drawings or photographs, and in Learned, the inventor admitted that he had never tested the device for its sole intended use—signalling at a distance at sea—and had regarded it more as a "curiosity"—and, in both cases, further development had been abandoned. The requirement that there have been testing under actual conditions was found to be necessary—as proof of the existence of the device claimed.

We have no such absence of evidence here, and further development of the device is just what has given rise to the defense by the Government that there was no reduction to practice.

We find that "Claim 4" of the patent was reduced to practice in the mock-up and that defendant had no express license to use it royalty free under Clause (a) of Article 30 beyond March 2, 1946.

We also find that it had no such license to use the mock-up under the Special Reproduction Rights Clause since those rights were specifically limited to blueprints, drawings—and nothing more —and inferentially by Article 28.

The Government also contends that the plaintiff shall have no recovery because the Government acquired a gratuitous implied license to use the invention in the equipment manufactured by Eastman Kodak Company. It urges that such a license may be supported on a theory of acquiescence, estoppel or shop right.

■ A gratuitous license, if established, would be a complete defense. The statute permitting suit (Title 35 U.S.C. § 183) provides that the Government may interpose all defenses available to it under Title 28 U.S.C. § 1498, which allows the defense of license (De Forest Radio Telephone & Telegraph Co. v. United States, 1927, 273 U.S. 236, 47 S.Ct. 366, 71 L.Ed. 625).

This defense was pleaded by answer alleging in the following language that defendant

"has acquired an implied license and a license by estoppel to make, have made, use and sell any and all devices of the kind made or supplied by the plaintiff under said contract."

This the defendant amplified by its answer to an interrogatory and stated:

"1. Plaintiff acquiesced in the production of sights by the Eastman Kodak Company over a period of many years. The acquiescence existed from 1947 until a recent date. * * * Plaintiff's acquiescence was in the form of voluntary cooperation marked by joint engineering endeavors, exchange of know-how, and a sharing of experience to the mutual advantage of plaintiff and the Eastman Kodak Company. * * * defendant will also rely on the fact that the so-called Brown Box mock-up was fabricated in and with the Government facilities and assistance. More particularly, the fabrication took place in premises owned by the defendant and on machinery owned by the defendant."

■ It is settled law that in those instances where it is found that the owner of a patent actively cooperated in a use of the patent without asserting a claim for use of his patent rights, he is deemed estopped to deny a license (Lukens Steel Co. v. American Locomotive Co., 2 Cir., 1952, 197 F.2d 939). This result has been reached by applying the doctrine of equitable estoppel. (Cf. Lukens, 197 F.2d at page 941; Dickerson v. Colgrove, 100 U.S. 578, 580, 25 L.Ed. 618.)

The cooperation on plaintiff's part with Eastman Kodak to which defendant points in support of a royalty-free license was initiated by the Air Force in December, 1945 while it was enjoying an express license under the development contract and was entitled under that license to engage Eastman Kodak or any other manufacturer to produce the sight. It was then that the defendant directed that Eastman Kodak be furnished with drawings and blueprints of the sight and that plaintiff complied. Again, it was at the express direction of the Air Force, at the expiration of its license (when it no longer had this right to bring in Eastman Kodak as a manufacturer) that the plaintiff continued to work with Eastman Kodak in the exchange of information and data. Throughout this time, plaintiff continued to be the sole manufacturer of the sight. The meetings in August 1947 and 1948, at which plaintiff agreed to continue to work with Eastman Kodak and to assist in bringing it in as a second source of supply for the production of the sight, were at the suggestion of the Air Force.

■ Under these circumstances—the danger of the defendant's having to rely exclusively on plaintiff for this important war equipment and plaintiff's inability to meet the growing demands of the Air Force especially in the B.-45 sight program—plaintiff's willingness and assistance to establish Eastman Kodak as another source and its sale of drawings and castings and exchange of know-how, can-

not fairly be held to be conduct estopping plaintiff from later claiming in good faith that throughout this time it expected and was entitled to compensation for Eastman Kodak's use of its invention.

True, plaintiff benefited greatly from this cooperation with the Air Force and from the joint endeavor with Eastman Kodak; from a small plant, it grew to be an important war-contractor. Alone, it could not have met the needs of the Air Force; however, the benefit and value of plaintiff's work to the Air Force seems to have been recognized as "outstanding" in the field. It was in the interest of the Air Force primarily to maintain interchangeability of equipment and closely related engineering production between these two companies. "It was a business relationship involving mutual confidence and mutual effort in which each party hoped to profit." Lukens Steel Co. v. American Locomotive Co., D.C., 99 F. Supp. 442, 446.

Although plaintiff never explicitly reiterated its demand for compensation at these meetings and through the ensuing years, it cannot seriously be contended that the Government because of this silence was misled into believing that plaintiff had abandoned the demands it had made in 1944 and 1945 prior to entering into the contract or had changed its position. Plaintiff had made its position unequivocally clear at that time and it had never swerved by word or conduct. In fact, it was only when admonished that refusal to grant the time limited royalty-free license sought by the defendant would hamper the war effort that it capitulated and then only for the specified time; this limitation was clearly understood.

The correspondence addressed to the Chief of the Armament Division and to the Air Force Contracting Officer, offering the mockup to the Air Force, inviting a discussion of royalties and insisting on a royalty patent clause, and the conferences at which this was discussed, was clear notice to the Air Force that plaintiff expected and would insist on compensation for the use by the Air Force. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10; Nuss v. United States, 117 F.Supp. 413, 127 Ct. Cl. 197.

The failure of plaintiff to disclose the filing of the patent application in August 1946, prior to defendant's engaging the services of Eastman Kodak as a second source of supply, did not mislead the defendant to its detriment. The tremendous expenditure and investment which defendant made in setting up joint production with Eastman Kodak was not action taken in the mistaken belief that it had an unlimited use of the invention free of liability. While it would have been preferable for plaintiff to notify defendant of this filing, its motive in not doing so is immaterial, since the total effect of its conduct was not such as to cause defendant to do something it otherwise would not have done. Gill v. United States, 160 U.S. 426, 16 S.Ct. 322, 40 L.Ed. 480; Dickerson v. Colgrove, supra; Barlow v. United States, 82 Ct.Cl. 360; Zeidler v. United States, 61 Ct.Cl. 537; Ordnance Engineering Corporation v. United States, 68 Ct.Cl. 301.

■ However, at no time did plaintiff register any protest or refusal to the inclusion of Eastman Kodak in the production of the sight; on the contrary, plaintiff eagerly cooperated; nor did defendant dispute the right of plaintiff to the invention. The past contractual relations between the parties as well as those which followed the joint endeavor between plaintiff and Eastman Kodak negate the theory of a tortious taking by the defendant. Plaintiff's claim here is for payment of just compensation for lawful use, not for compensation for unauthorized use, as for a tort. Title 28, § 1498; Zeidler v. United States, supra, United States v. Palmer, 128 U.S. 262, 9 S.Ct. 104, 32 L.Ed. 442; Union Shipbuilding Co. v. Boston Iron & Metal Co., 4 Cir., 93 F.2d 781. We are mindful of United States v. Bethlehem Steel Co., 258 U.S. 321, 42 S.Ct. 334, 336, 66 L.Ed. 639, where it was written:

"We have in other cases expressed our aversion to the latter conclusion (a tortious taking), except upon explicit declaration or upon a course of proceedings tantamount to it. A contract, expressed or implied in fact, must, it is true, be established; but one to pay for a mechanism used will be implied rather than a tortious appropriation of it—rather than the exercise by the United States of its sovereignty in aggression upon the rights of its citizens. * * *

" * * * where the government uses a patented invention 'with the consent and express permission of the owner' and does not 'repudiate the title of such owner', an implied contract to pay a reasonable compensation for such usage arises."

See also Walker on Patents, Vol. 2, 1468–1471.

■ But, this finding (of an implied license) does not also compel the conclusion that plaintiff's claim may be prosecuted only in the Court of Claims as a suit on an implied contract in excess of $10,000. Title 28, § 1346(a).

True, the Invention Secrecy Act provides that all defenses available to defendant in a suit for compensation for unauthorized use under Section 1498, Title 28, United States Code, are available to defendant under the Act, and in De Forest Radio Telephone & Telegraph Co. v. United States, 273 U.S. 236, 47 S. Ct. 366, 71 L.Ed. 625, under strikingly similar facts, in a suit brought under the Act of 1910 as amended by the Act of 1918 (present Section 1498) the Supreme Court held that the finding of an implied license to the Government barred plaintiff from recovering compensation for unauthorized use under Section 1498. Consequently defendant argues that what is a total defense under Section 1498 is a total defense under Section 183 and that plaintiff must be non-suited. This much we think is so: that all defenses on the merits available to defendant to defeat a claim for compensation for unauthorized use are available to defeat a claim for compensation for use under the Invention Secrecy Act—gratuitous license, invalidity, non-user, payment—but not to defeat the jurisdiction of the district court to adjudicate the claim. To hold otherwise would nullify the purpose of the Secrecy Act which is to encourage inventors to "submit" their inventions to their Government and to protect them by enabling them to bring suit in their own district court instead of being obliged to go to the Court of Claims, and to provide the same choice of forum as under the Mutual Security Act. Halpern v. United States, 2 Cir., 1951, 258 F.2d 36; Robinson v. United States, 2 Cir., 236 F.2d 24. Neither the language of the Act, which makes no mention of unauthorized use, but does require use resulting from disclosure by the inventor (and which prior to 1952 required tender), nor its comprehensive scheme of providing compensation in all cases where secrecy orders are issued permits of this interpretation. Robinson v. United States, supra; Zeidler v. United States, supra.

■ The fact that plaintiff may have used Government facilities, machinery and time for developing its mock-up would not result in a gratuitous license to the defendant (Solomons v. United States, 137 U.S. 342, 11 S.Ct. 88, 34 L.Ed. 667). A shop right which is the right in a master to practice an invention on a non-exclusive basis arises where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent. The theory is that if one is hired and paid to develop an invention, it is unfair to again exact payment from him who bore the cost of development. But the right of the master even in shop right is non-exclusive and the patent remains the property of the servant with a right to exclude all others than the employer from the accruing benefits. United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114; Cahill v. Regan, 5 N.Y.2d 292, 184 N.Y.S.2d 348.

■ Defendant relies on the fact that from 1940–1946 during which time the mock-up was reduced to practice sub-

stantially all of plaintiff's business consisted of Government contracts, that it had at its disposal Government-owned buildings, machinery and tools, and that the salary of Tripp was being charged to the Government as a cost item.

Plaintiff denies use of Government property. When the mock-up was reduced to practice plaintiff was not under contract with the Air Force for the development or manufacture of a firing sight other than the old Mark 33; the invention was not required in the performance of any existing contract for the Government and it was not part of any general research work financed by the defendant in which plaintiff was engaged. Although the work was undertaken at the suggestion of the defendant and was closely related to the Mark 33 sight which plaintiff was then supplying, the development of the mock-up was an independent venture engaged in by plaintiff and Tripp was not an employee of the defendant. Gill v. United States, supra; Lane & Bodley Co. v. Locke, 150 U.S. 193, 14 S.Ct. 78, 37 L.Ed. 1049; United States v. Dubilier, supra.

Moreover, as a ground for raising an estoppel against plaintiff "the fact * * * that the patentee made use of the property and labor of the government in putting his conceptions into practical shape, is important only as furnishing an item of evidence tending to show that the patentee consented to and encouraged the government in making use of his devices. The ultimate fact to be proved is the estoppel, arising from the consent given by the patentee to the use of his inventions by the government, without demand, for compensation." Gill v. United States, supra, 160 U.S. at page 435, 16 S.Ct. at page 326.

This we have found plaintiff never did.

▆▆▆ Finally, we reach defendant's contention that plaintiff cannot recover as a matter of law because in filing its application for a patent it violated the secrecy provisions of its contract—in that it disclosed the invention to its patent attorney and to the employees of the Patent Office.

The contract was classified information. Under Article 40, plaintiff bound itself to comply with the pertinent regulations, particularly paragraphs 64 and 72 of Army Regulations 3805, March 15, 1944, and not to publish, divulge, sell or dispose of any information of material which included, referred to or incorporated such classified information. Under Article 30, plaintiff was obligated prior to final settlement to disclose to the Government all inventions made or first reduced to practice in the performance of the contract and to designate in writing which of said discoveries had been or would be covered by applications for patents filed by plaintiff. Since the mock-up was not reduced to practice in the performance of the contract, the application of August, 1946 did not come within these conditions and any applicable prohibition would have to be found in Article 40.

At the time plaintiff entered into the development contract, it had a property right in the mock-up and a right under the patent laws to file an application for a patent covering the invention. Gayler v. Wilder, 10 How. 477, 13 L.Ed. 504; Keystone Type Foundry v. Fastpress, 2 Cir., 272 F. 242. This was made very clear to the Government and we have found that it was on notice of plaintiff's rights in this respect. All the negotiations and letters, and the difficulties encountered in the contract negotiations, gravitated about this invention and arose from plaintiff's requests for a patent royalty clause. In spite of the defendant's demands for an unlimited license, plaintiff consented only to a time-limited royalty free license. Plaintiff's attitude at all times was that of an owner of a valuable property right who was zealously protecting its property. Before we may fairly conclude that in entering into this contract plaintiff conditioned its right to seek the protection of the patent laws and of the Invention Secrecy Act on permission of the defendant, we would have to find language in the contract to such effect;—and there is no such language. In view of plaintiff's consistent

position in all its negotiations with the defendant that the defendant had no rights whatsoever in and to plaintiff's invention—other than those limited rights plaintiff was willing to grant for which defendant would have to pay—we conclude that under the contract it surrendered to the defendant nothing more than royalties under the time-limited license.

There is no reason why it could not have relinquished in the contract its statutory right to file for a patent, but the fact is that it did not. If the defendant intended to or desired to obtain this waiver from plaintiff, it could have written such a provision into the contract; the fact is that it did not when it drew the contract and set its terms and provisions. We find that the fact that the parties were particularly conscious of the mock-up is strong evidence that it was not within the contemplation of either to include the filing of a patent application on the mock-up within the prohibition of Article 40 against disclosure. This is not to say, of course, that any disclosure of the mockup other than the limited one necessary to filing for a patent was not encompassed within this clause.

We have proceeded on the assumption that disclosure prohibited by Article 40 included disclosure by filing for a patent. It seems, however, from the wording of the provisions of Article 30 relating to notice to the defendant as to inventions which "have been covered" by application that patent applications were not included, since final settlement under Section 183 can be had while a Secrecy Order is still in effect and while presumably the secrecy provisions of any contract covering the invention would also be in effect. Halpern v. United States, supra.

We conclude that plaintiff never waived or relinquished its right to seek the protection of the Invention Secrecy Act; that it never conditioned its right to do so on securing permission from the defendant; and that the disclosure to its patent attorney and to patent office employees was a disclosure essential to invoke the protection of the Act, and was not violative of the secrecy provisions of the contract or of the espionage laws. Cf. Allgrunn v. United States, 67 Ct.Cl. 1.

As was pointed out by Judge Waterman in Halpern, the necessity for secrecy must not be so emphasized as to defeat the purpose of the statute to encourage and protect inventors in their property.

In the solution of "the manifold problems engendered by the creation of the remedy" (Halpern v. United States, supra, 258 F.2d at page 37), this Court has had the benefit of thoughtful, scholarly, considered and well-written briefs from exceptionally capable and learned counsel for both sides. This has lightened our burdens.

The trial of the second phase of this suit—as to the amount of compensation plaintiff is entitled to receive under 35 U.S.C. § 183 and 22 U.S.C.A. § 1758, if any, will be set down before me for a time agreeable to counsel during the November, 1959 Term.